Good morning, Your Honor. Proceed. May it please the Court. My name is Manny Guerra and I represent the Plaintiff Appellant Decedent in this case. You're going to have to, maybe we can turn the volume up. I'm not going to hear you. My name is Manny Guerra and I represent the Plaintiff Appellant Decedent in this case for a 1983 wrongful death case that was brought in the Southern District of Texas. And a summary judgment was eventually granted by the District Court. Although the appellants have appealed on nine grounds, I'm here to talk to you today about two of the most prominent features of those grounds today. Those two grounds would be that the District Court went beyond its role as a neutral arbiter in granting summary judgment in this case. That would be one of the grounds I'm going to talk about. The other is the relevance of the Punisher and the Donna Hilton signs that were posted in the city jail for Donna by the Chief Policymaker De Leon. You've raised 12 grounds. You didn't file a reply brief, correct? That's correct, Your Honor. And you've only brought a claim against the municipality. There are no individual defendants here. That's correct, Your Honor. Okay. So what's your best case as to municipal liability? Is it the argument that the signs were a custom and policy? Yes, Your Honor. The mistreatment of detainees is the policy announced by the signs. The signs being the Punisher sign and Welcome to Donna. Is there any other theory of municipal liability you've asserted, or is this it? Municipal liability, well... Some custom and policy that's the moving force. That's the moving force. That's it. There are episodic facts, which we have pled both, Your Honor. So yes, we have gone on both of them, but we believe that the moving policy, in this case behind the Chief Policymaker, repudiating the constitutional requirements, are these signs. And we believe that that moving force was prevalent and pervasive throughout this jail. And if you look at the facts that are very fact-intensive, you will see that there was a complete disregard. You're saying that your argument is that but for the posting of these signs, the injury would not have occurred. We're not saying it's a psychological trigger, Your Honor. We're saying that the treatment of the detainees, as announced by these signs, was the condition that they were advocating, that the chief advocated in this case. Don't you have to say that the signs were the moving force of this man's death? Yes, Your Honor. You do? Yes. But for the signs, he would still be living, just in practical terms. Well, I don't know about that, Your Honor. I think that the sign is the policy, but I do believe that this jail was so the officials there were so malaligned with what a proper running jail should be that on a daily basis the pretrial detainees were harmed. I mean this came off the happening of an in-death custody a week prior. Did you show any other incidents of prisoner constitutional injury at this jail? Well, that one that I mentioned, Your Honor, previous, but there are no other suicide deaths. However, I believe we fall under the other factors that would allow us to tell you that. Is there evidence of constitutional injuries to prisoners as a result of the policies of the jail? Sure, Your Honor. Like I said, a week before there was another in-death jail custody death in which that prisoner died. Is that in evidence? Yes, sir, it is. And what did you show in that respect? Did you all litigate that in terms of the cause of the death and the absence of the injury, the absence of what caused his death, what caused that man's death? My understanding is that while being taken into custody, the knee of one of the officers was pressed so hard on his thoracic part that he died. But not in the jail or upon arrest? No, he's in custody but not in the jail. That's correct. So the theory isn't that the signs distracted people that should have checked on him. The theory is that the signs are sort of representative of an attitude, I guess an attitude to intentionally harm. Is that the argument you're making? That's correct, Your Honor. This was prevalent throughout prior to this. It's just that the final policymaker, the chief of police, in the responses afterward directly reflected what it was before. In other words, their attitudes, their treatments, their mistreatments, the way they went about everything, was just contradictory to how the constitutional treatment of pretrial detainees should have been. But unlike the other episode you just described where there may have been police arrestee physical contact, here this is a case of suicide. This is a case of suicide. So there's no issue of them reaching out to harm him. I thought your case was did these people have actual knowledge that he had suicidal tendencies? Your Honor, with regards to the arrest of this deceit, Mr. Garza, his mother enunciated to the arresting officers, I cannot control him. I'm concerned for him and his harming himself. I'm concerned about his combative nature toward my other son, Gilbert. So the arresting officers had that information about the intoxication, about being combative. He was arrested for assault by threat. He was taken in. But that was never conveyed to the people in charge of his custody at the jail, was it? It was not conveyed, Your Honor. And according to a case of the two unknown officers versus the city of Houston, that shows a deliberate indifference. That shows a disregard for the safety of this detainee. He was not checked in the jail cell for three hours for the time that he was there. A defendant's own expert, Margo Frazier, states that if you have a person that is not checked for three hours, I've got to assume that somewhere in there there's going to be harm. The chief of police himself also indicated, well, I didn't know that he wasn't checked. Okay, so it brings to mind the changing of the certified government document of the prisoner jail law. An hour after this incident, the rangers were in there, Garcia and Callaway. They took photos of all these, of the area, the booking area, and the prisoner jail law showed that there was no jail check because when you blow up that photo, you can see at 9, 50, or 10, 30, whatever time it was, they had contemporaneously written down when they checked on him. So when we received the discovery, lo and behold, it's filled in. So during the deposition of Jailor Garza, Esteban Garza, I asked him, you know, well, what happened here? What's the situation? He said, well, I went back and checked the booking video footage to see what time I checked him, and it was at 8, 10. So when I took the deposition of the other jailor on duty at that time, Nathan Coronado, Nathan Coronado stated we went through the films of what we had and what they were doing, and every frame of 8, 09, 8, 10, when apparently it should have taken place, 8, 11, 8, 12, 8, 13, there was no jail cell check. He admits on the record there was no jail cell check. I thought the video camera shows them leaving their office at about 8, 10. Well, when you look at the actual cell footage. Well, the inside cell footage. Cell footage. But are you disputing that the cell footage that is focused on the jailors, they actually do get up and leave at about 8, 10? Well, that's where his testimony changes in his deposition. He told the Texas Ranger in transcript under oath that he had laid eyes on him, that he went into the jail cell, that he actually talked to him, that he was checking him out about what he can do to get out early and to have some good time. So he says all these things. Then in his deposition he says, oh, we were just at the cell check about 20 feet away. We looked in, but it has this real dark mesh when I inspected it, and you just really can't see through there, in my opinion. But nevertheless, that was an altered document, and it was not reported to the Texas Rangers. And you have to assume, Your Honors, that this was a situation where it just didn't happen for those three hours when it should have. But they didn't even come in till late, those two. So when you say three hours, that requires you to embrace Officer Perez not looking at the cameras, correct? It's not as if the two jailers doing the signs were there for three hours working on signs. If they arrive at 8, then there's the disputed question of whether they actually checked through the window or went in at 810, and then Mr. Garza commits suicide before 9 o'clock. But when you look at the cell footage at 810, you can see Garza preparing the camera, standing on the bench, starting to think about how he's going to complete this hanging or this suicide. Okay, so why isn't it just a series of deeply tragic individual actions? So Officer Silvas, is that correct, the arresting officer? Silva. The allegation is he hears the mother say he's a danger, but not suicide. And then he may or may not have related that conversation. The booking camera video doesn't exist anymore. Then we have the jailers, you focused on doing the signs. They could just as well have been reading a book. But they haven't been told he's suicidal, and neither has Ms. Perez. So I guess what I'm really looking for is do you have any case that meets the deliberate indifference standard of any of these individuals had actual knowledge of his suicidal tendency? What's your best case that anyone in the sequence, even if they each were derelict, she stops looking at the camera, they're doing the signs, Silva doesn't pass on. What's the best case? Your Honor, while it's true that our facts don't resemble the standard issue condition of confinement case, and in answering your question, I'd say it's the Grandstaff versus Borders, the closest one. There is likewise nothing standard issue about the police chief openly advocating the mistreatment of detainees. But there's no allegation the police chief here knew of this man's suicidal tendencies. He may have told them read books or not. But, Your Honor, it wasn't the police chief that went out to investigate him. It was Silva and Estrada. And the mother did state on the record that she told them, I can't control him. I'm scared for him hurting himself and hurting his brother. I just can't control him. And she said that two times. And so there's a genuine issue of material fact as to that. There's a genuine issue of material fact as to existence of whether the conditional practice of confinement in the city of Donahoe Jail was the official encouragement of the intentional mistreatment of the detainees, evidenced by the final policymaker ordering the custom training and posting of signs, openly advocating the mistreatment of detainees in a manner grossly consistent with the constitutional rights. And going back to Minerva Perez, Your Honor, that's probably the most egregious disregard, subjective knowledge and disregard for substantial risk of harm, because the only order that existed in this case really that would govern her was the prisoner check order. And that's on record 18-40044.1406. And Chief de Leon specifically said that out of all the orders, this was the order that this dispatcher was supposed to follow. She was supposed to follow this. And when asked on page 66 of her deposition, you know, even if you would have seen this camera covered, you wouldn't have done anything. And she responds, no, I'm not supposed to. I shouldn't have. I shouldn't have to. Just simply what I figured out is she felt like when the jailers were hired, that was something that was off her plate. She didn't have to worry about it anymore. But that was the only written order. There was no other written order. It's a planned thing. She's in clear defiance of the written order, saying she's supposed to watch the cameras? Oh, yeah, absolutely. She says there was an unwritten order taking her out of that requirement. But that's not the case because, you know, you have an unwritten order from the chief of police. And then Garza and Coronado are in clear defiance of the requirement that they should be checking every hour? Clearly. Okay. But if both those are the clear orders from the chief, this doesn't sound like a case against the municipality, right? If anything, you've just said that the municipality was clearly telling all these people, check, watch always, check every hour, and they didn't. So where's the case against the defendant? He's the policymaker. It comes from the policymaker, Your Honor. But you just told me his policy was you all have to be checking. Well, that's what he said. But obviously when you look at the facts, they weren't checking. So what's your theory of municipal liability? Have you argued one of failure to train here? Have you given us that case law? We did argue failure to train, Your Honor. Where is that in your brief? That's right. You can get back on a rebuttal and point it out to me if that was your argument. But, Your Honor, what I wanted to say is that the order had no legitimate governmental objective as to putting up the signs. Yeah. Okay. Chief Esmeralda Pettis had an order that met the legitimate government, and she disregarded it wholly and completely and stood by the fact that it was the jailors that were supposed to be checking. This camera was obscured for 26 minutes, 26 minutes, and not once did she ever give a second thought about informing patrol or the jailors, hey, go check this out. Right. That in itself, Your Honor, should allow us to Why didn't you charge the individual defendants? I just felt like this was more of a case towards the policy of the jail in the city, and there has been a lot of potential liability that's come out as a result of that. People have lost their jobs, et cetera, things of that nature. But, nevertheless, this is where we're at. I believe they're a genuine issue of material fact. We'd appreciate the opportunity to go back to the court and have a jury hear our case. Thank you. May it please the court, good morning. The difficulty you're having in evaluating this case is because the appellants want to mix proverbial metaphors. What they want to do is argue episodic acts and omissions sometimes and then say those episodic acts and omissions were sufficient to establish a conditions of confinement without establishing the facts necessary to establish either one. Let me back up a little bit and talk a little bit about the facts. At 5.35 a.m. on February 19th, Veronica Garza called the police because Jose Luis and her brother and his brother were fighting. Jose Luis was under the influence. He had been drinking and taking drugs that morning. Later, they found ethanol and alprazolam in his bloodstream. Previously, she had sent him over to MHMR to try to get drug treatment. He did not want to cooperate. They tried taking a number of times, what the doctors there told them, unless he wants to come, it ain't going to work. So she called the police because she was concerned they might hurt each other because they were fighting. She did not mention suicide. She agreed Jose Luis never mentioned suicide. That's at record 1160 to 62 and 1167. Also, the mother did not call. This is significant. The mother did not call MHMR for treatment, suicide treatment. That's at 609. She was aware MHMR is available. When I asked her in her deposition, she agreed that all the police can do is arrest him. If the police ever have any reason to believe that an arrestee has some kind of issue, whether it's medical or psychological, if it's medical, they call an ambulance, and if it's psychological, they call an evaluator or something like that, somebody to come over and make the evaluation and take him over to MHMR, whatever they have to do. That ties in with the chief's general approach to having arrestees there, which is if they're happy and quiet, they're not my problem. They'll be somebody else's problem later maybe over at the jail, but they're only here for a short period of time. So I'm going to do whatever I can to make them happy. If they want all the number of phone calls they want, they can have them. If they want Whataburger, I'll go get them Whataburger. Granted, his style may be unorthodox, but he did not have any actions or procedures or policies or rules and regulations that would have constituted a violation of anybody's rights. Now, I don't mean this offensively, but I think what the mother wanted was a babysitter. The police are not babysitters. She wanted somebody to come get him, take him somewhere else where he could dry out, and he's not going to get in a fight with his brother. Mother did not say she wanted any kind of specific concern about suicide. She said, I'm afraid he might hurt himself or his brother. Now— Is he drunk or just on drugs? Both. They found ethanol, which is alcohol. So he's on drugs, he's drinking, he's fighting. The mother says, I'm worried about him being a danger. Then when he gets there, he goes unchecked for three hours. Actually, that's not accurate. Let me finish. I'm just putting the full assembly and I'm wondering why this wouldn't be actual knowledge of a suicidal tendency. If the allegation is he goes unchecked three hours and it's undisputed he's banging frantically, loudly, but it turns out instead the officers that might respond to a frantic, frightened person are doing these deeply offensive signs. And the last piece of the puzzle is that it seems the allegation is two critical pieces of evidence, the booking video that would show how compromised was he, as well as the log that would validate the claim that they actually checked him minutes before he committed suicide. Those two have been altered according to the allegation. Why isn't that assembly of facts sufficient to show these people were on knowledge that he had suicidal tendencies and they disregarded it because they were too busy with their torture signs? This is not a 12C motion for judgment on the pleadings. This is a motion for summary judgment. On the pleadings, I agree they alleged all those things. However, the evidence did not show that. To back it up a little bit, ICE agents… No evidence showed that. No evidence supported… Didn't support most of that. Let me break it down. Okay. The ICE agents arrived at 849. The difficulty the plaintiff, the appellants, had in this case is what they wanted to say from the beginning was that, look, the timing's off. But they admitted in their pleadings that the timing on the camera was off an hour and ten minutes. Right. So when he goes and asks the witnesses questions during their depositions, he's saying, look at the video. It says 810 and nobody's doing anything. Well, we know that they left the room, but we don't know that they actually went in and spoke to him because the camera doesn't show them doing that. We didn't have that camera. That was not requested. That was not saved for whatever reason. The Texas Rangers came in and asked for all the documents and evidence that they wanted. We produced everything that they asked for, and in doing so, they didn't ask for that one for whatever reason. And as a result, we didn't save it. It didn't occur to us, and nobody asked us to save that one in particular before. When you say that one, I thought it was just the booking one that's missing. There's another one that's missing. No, there's different cameras. One is in the booking room. That's the one you have. That's the one that was presented here. There's a separate one that's in the jail. Booking room is coming in this way. Jail is coming in this way, and it would have shown an angle. I don't know that it would have shown inside the jail. It shows the edge of the door to the jail inside. I thought we absolutely do have the one that gets obscured, and that one doesn't show them ever coming in the cell. That's different.  All right. So, anyway, the one leading into the jail area is the one we're talking about at the 810 mark. When he's asking questions to the witness, he's using what the video actually says instead of backing it up to the 810 mark. So he's getting answers that, you're right, it doesn't show that. What it does show is that seven seconds after the ICE agent's going at 849, four men – seven seconds later, the jailers run into the jail area from that camera from the booking area. That's the one that you have. And then you have the four men carrying him out a minute later after entering the cell. Now, on the booking room videotape, what happened was the officer – after the Texas Rangers went away, the officer – and they released all the documents back. The Texas Rangers took whatever documents they felt were appropriate. And then the officer, Officer Garza, got that booking sheet, went to the video, checked when he went back there, made a notation on the booking sheet that that was the time that he had gone back there because you could see it on the video that he's going from the booking area to the jail area. It doesn't show the jail area, but it shows that he was going towards that area, and that's where he was able to write that recollection at that time. When we asked the Texas Rangers if that was an appropriate way of doing that, they agreed yes, it was, because a lot of times you don't do things in real – you don't write notes of what you did in real time. You do it afterwards. The indications are that he did go back at 810. He was able to verify that through the video, and that's what he did. What happened was at 810, Jose Luis was making noise prior to that time. When they make reference to him making noise, it wasn't over a three-hour period. And for that matter, if you look at the video that was available to the dispatcher prior to that time period, you see him doing some things and playing with the water. He had basically flooded the cell area, and he had been banging on the door. That happened before 810, after you modify or adjust for the time on the camera. That happened before 810. At that point, after – you could kind of see him hanging on the bars, holding on to the bars, and it looks like he's talking to somebody from inside the jail camera. After that, you don't see him banging anymore. You don't see him doing anything before the camera is covered inside the jail cell. So he's doing whatever he's doing, but the noise and all that was what caused Officer Garza and Coronado to go into the cell. They talked to him at that point. They told him what's going on, bro. These facts are all – they've been put in the record in the brochure. Yes, Your Honor. But what is your argument? We should affirm the district court's ruling because of what? Well, first of all, it's complicated because – basically because plaintiff or the appellants have not identified a violation, an episodic act or omission for which the city would be liable or a condition of confinement for which the city would be liable because he has not identified facts to establish either claim. And is that what the district court held? The district court, in trying to evaluate what he was claiming, he was – I think what he was trying to claim is a mix of both, and the district court concluded that he did not establish a violation of either, and she evaluated the law on both. Well, when you say she evaluated the law, I thought she assumed a plaintiff has to show that a public officer's response indicates subjective intention that harm occurred. And then she went through one by one and said, I don't see an intent to harm. Right. Is that statement of law valid law, Supreme Court or Fifth Circuit law? Are you asserting to us today that a plaintiff has to show a subjective intent to harm to prevail? Well, depending on whether you're talking about episodic acts or conditions of confinement. For the episodic acts, you've got to show, for example, Hyatt v. Thomas, in which Judge Dennis wrote the opinion, I believe, liability requires actual knowledge of the risk of suicide. Negligence is not enough. Right. Actual knowledge of the risk is not intent to harm. Well, the intent to harm, I think now you're talking about what the city or the individual you're trying to do to harm the individual. And now what you're talking about is whether there was evidence of an intent to harm to establish some form of episodic act. And I didn't see any. I don't think the judge found any, that there was any evidence. Did the judge ever shift to the alternate valid theory that you just have to show actual knowledge of a suicidal tendency? Did the district court ever consider that? Actual knowledge of what? Suicidal tendency. They did. I think they said that in order – that gets back to whether you're showing that the conditions of confinement – I'm just asking you to tell us what is the best reason you think we should affirm this ruling. What's the best – instead of telling me that they made a complicated argument, you would say what? The district court ruled correctly or the district court's ruling didn't reach an issue that's dispositive? Well, I think the district court ruled correctly. What he was trying to argue was conditions of confinement. And I've got to – I'm sorry I have to break it up, but on the conditions of confinement, they ruled correctly because he did not establish a well-established practice within the jail. Yes. They didn't cause that. There's little case law on suicide conditions of confinement, so put that aside. Okay. So if it's episodic actual omissions, if you're talking about what any individual did, you've still got to show objective – even if you subjectively show that the individual intended to harm, you still have to show a customer policy objectively viewed that would establish liability, and they found them. Well, the district court never reached that level, never got to the municipal policy question. Because they never were able to establish that there was any subjective intent to harm. My suggestion to you is that that is not the correct standard. It exists in some case law, but that's a higher standard than the Supreme Court and our controlling precedent would require. All that's got to be shown by a plaintiff is that they had actual knowledge of the suicidal tendency and disregarded that. They don't have to have the subjective intent to harm. So if all the district court did was address the latter, and if I'm right that that's wrong, it would seem like we couldn't resolve this in your favor without a remand for the court to either apply the correct state of mind or for the court to say, I don't see a customer policy. In fact, the plaintiffs are saying the customs and policies that were in effect were the ones that we wish had been followed. Wouldn't matter anyway. Right. And what I'm saying is that what the court was looking at was there was no deliberate indifference on the part, and that's why she evaluated each individual's actions. There was no deliberate indifference of any of those individuals, which would be the first step before you get to the custom and policy of the city. There was no deliberate indifference of anybody because they didn't know about any of this. Chief De Leon, for example, wasn't even present at the time of the suicide. I understand that. And let me respond to what you were saying, what he was saying about her testimony in terms of evaluating monitors. I objected to the questioning. But what he was asking was, what do you do? And she said, this is what I do. Now they have a glass window and the jailers are monitoring through a glass window where they can see it. They didn't have it at the time. When he's asking the question, he's asking, what do they do? She says, the jailers look through the windows, so I don't have to be concerned with that because they're doing it. It's now their job to do that. At the time, we didn't have that window, and it was the jailers – I'm sorry, the dispatchers' duty to review the cameras. Has their theory of municipal liability based on Perez's behavior been one of a failure to train her? Has that been their theory? I could say he's made noises that sound like that. I don't know that he's made that claim specifically. But the failure to train – she was trained as a dispatcher. She was trained that she has to look at the cameras. They have not identified any specific basis to support a claim that what they did was not sufficient or that some other training was constitutionally mandated. What they want to say is there's a lot of other things that we would like them to have done, but they haven't identified anything that's constitutionally mandated that we had to do. The only connection they had to a possible suicide was the first officer, Silva, who the mother said, I'm afraid they might hurt each other or I'm afraid he might get hurt. He never drew that inference that there was a suicide risk. And even if he did, he didn't repeat it to anybody else. He did not repeat it to the other officers who were there, Sergeant Estrada. She didn't repeat it to either of the jailers, Coronado or Garza. When Captain Suarez and Lieutenant Rosas came in, they immediately started giving him CPR. None of them were aware of any suicide or potential suicide. And specifically, Dispatcher Feddes agreed that she was never aware of any risk of suicide here. Without knowledge of a risk, you can't show that we were deliberately – either of those persons were deliberately indifferent to be able to get past that first step. He's not talking about a single incident. I don't think he is. There has been no other evidence. I would refer to – I think you had a question earlier about a prior instance that he had referred to. The prior instance had to do with an arrest of somebody off premises who also was on drugs. I believe that person was tased. He was on the ground. He – I think he coded for a while, but then he came back. He was taken to the hospital and died at the hospital, I want to say, three or four hours later. He did not die in the custody of the police. He died three or four hours later at the police department, and I think they ultimately concluded there was some drug involvement that led to his death. I would refer to the State of Pollard, which I believe you wrote, which the court acknowledged that even knowledge of the suicidal nature of a recent suicide attempt, neglect in performing a 15-minute check, is not deliberate indifference. As in this case, it didn't even rise to that level. Everything that they did here might have been ignorant, might have been they didn't have enough information to be able to decide, but you can't show deliberate indifference on the part of anybody necessary to get to the customer policy, necessary to establish an episodic act or remission claim. Actually, for comparison, what I would refer the court to more than anything, I think it's a fairly recent case, Alderson v. Concordia Parish, 848 F. 3rd 415. I don't think you wrote it. I like that case because it makes a very clear distinction. For example, it involved a guy who was complaining about a medical condition. He asked for medical treatment, and the guard ignored him, didn't give it to him until after the end of the weekend, and I think he was badly hurt, and he complained later about the injury that he had to suffer over the weekend. What the court found was that the officer who delayed a specific response for assistance, a request for medical treatment, could be deliberately indifferent. However, the claim against the supervisors for failing to protect him through supervision or through misclassifying his injury were not liable because you couldn't show they were deliberately indifferent. In other words, if one person had specific knowledge of a particular potential injury or risk or request for some form of medical treatment and that officer refused to give it, you could argue at least, even though he didn't do anything non-action, that he might be liable. But where you don't have even that against anybody in our case, I don't think you can establish deliberate indifference or the customer policy of the city. That's the main distinction because in most of the other cases that are talking about what happened, they're talking about specific affirmative action as opposed to non-action. This case is full of non-action. He's complaining that we didn't do something when he believes we should have done something. Although there's no evidence to establish we knew there was a risk of suicide, and beyond the initial officer, there was no indication from anyone that anybody at the jail would or should have known of a risk of suicide. And without that, you can't hold the city liable for not taking action or developing policies where they did not know because there's no constitutionally mandated requirement that certain policies – sorry, I'm looking for the specific language, specific cases. Taylor remarks no right to a certain suicide screening or prevention protocols, a Supreme Court case, and then Whitley-Stevens County where there's no constitutional violation for failure to train for latent suicidal tendencies. My time is about up, but unless you have any other questions, that's all I have. Thank you for your consideration. Thank you, sir. May it please the Court. Your Honors, Your Honor, Higginson, on page 53 of our appellant's response, we address the point that the district court erred in failing to address plaintiff's failure to train and ratification claims, and we state in that, in those paragraphs, at page 75 through 81 of our summary judgment response, we complained extensively and we argued that the defendant was guilty of failing to train its employees pursuant to the Canton v. Harris case for 89 U.S. 378, 1988. In particular, plaintiffs argued that such failure to train was demonstrated by dispatcher Bettis's utter confusion about the scope of her duty to monitor decedent via closed circuit and the defendant's response to the discovery of the decedent's suicide attempt. Now, that footage, as Your Honor was indicating, specifically from when he initiated the booking process at 555 at the Donnell Police Department Jail to 605 A.M., was destroyed, okay? The booking. The booking footage video was destroyed. And that came after I had requested that preservation of that footage, that video, within three days after this event occurred at the jail. And that, along with the alteration of the prisoner jail log, that with the fact that Minerva Bettis believed that there was some type of a jailer's pod that was there before this event occurred, which they were just completely had eyes on to the jail cell, that on with regards to taking the deposition of Nathan Coronado and showing him frame by frame of this video, where is it that you all go in there and talk to him? It's not present. He admits, we didn't do it. And they come back around and go contrary to what they told the Rangers. You know, there are just so many misrepresentations that are made by the chief and his staff that it equates into a complete lack of fair trade, a complete lack of preparation. Even when Ms. Bettis indicated these things, she was barely not able to pronunciate, hung himself and said, tongue. They came in, the EMT is looking for a tongue bite. I'd say also with regards to the 56F situation, that we should have had an opportunity to respond to these additional arguments by the judge, and we were not provided such. And so I'd appreciate y'all's consideration. Thank you. Let's take a break. Before we pick up the last case for today, the court will be in recess for approximately 10 minutes.